## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DYLAN TOKAR,

           Plaintiff,

     v.                                    Civil Action No. 16-cv-2410 (RC)

UNITED STATES DEPARTMENT OF
JUSTICE,

           Defendant.

## DECLARATION OF DYLAN TOKAR

I, Dylan Tokar, declare as follows:

      1.      I am a journalist for *Just Anti-Corruption*, a trade publication for lawyers that

reports on the Department of Justice ("DOJ") and its investigations into violations of the Foreign

Corrupt Practices Act, 15 U.S.C. § 78dd-1, *et seq.* ("FCPA").  I have held this position since

November 6, 2014.  I have personal knowledge of the matters stated in this declaration.

      2.      I have reviewed the declaration of Peter C. Sprung that was filed in support of

DOJ's Motion for Summary Judgment in this case, ECF No. 9-2 (the "Sprung Decl.").

      3.      During my nearly three years as a reporter for *Just Anti-Corruption*, I have

reported on the increased use of deferred prosecution agreements ("DPAs") entered between the

DOJ and corporations to resolve alleged violations of the FCPA.  I have also covered the use of

corporate compliance monitors, who are appointed pursuant to a DPA or plea agreement with

DOJ.  DPAs allow corporations to avoid criminal prosecutions.  Sometimes, a corporation will

agree to hire a DOJ-approved independent corporate compliance monitor at significant cost to

the company.  These monitors oversee compliance reforms at a company that has settled alleged

FCPA violations and file periodic reports to DOJ over an agreed-upon term.

4.      Based on my research, it is my understanding that the corporate compliance

monitor selection process used throughout the DOJ is governed by principles established in 2008

in a memorandum written by then-Acting Deputy Attorney General Craig S. Morford (referred to

hereinafter as the "Morford Memorandum").  A true and correct copy of the Morford

Memorandum is attached hereto as **Exhibit A**.

5.      It was widely reported at the time the Morford Memorandum was issued that the

memorandum was DOJ's attempt to address concerns that were raised by Congress after then-

U.S. Attorney Chris Christie approved an 18-month contract worth $28 million to $52 million for

his former boss (and former attorney general) John Ashcroft to serve as the compliance monitor

for the medical device company Zimmer Holdings.   *See, e.g.,* Philip Shenon, *Ashcroft Deal*

*Brings Scrutiny in Justice Dept.*, N.Y. Times, Jan. 10, 2008.  A true and correct copy of this

publicly available news article is attached hereto as **Exhibit B**.

6.      Immediately prior to the release of the Morford Memorandum, Congress held a

hearing on the subject in 2008 titled *Deferred Prosecution: Should Corporate Settlement*

*Agreements be Without Guidelines: Hearing Before the Subcomm. On Commercial & Admin.*

*Law of the H. Comm. On the Judiciary*, 110th Cong. 312 (2008).

7.      Among other things, the Morford Memorandum requires that the "corporation and

the Government [] discuss the necessary qualification for a monitor based on the facts and

circumstances of the case" and "avoid potential and actual conflicts of interest" in the selection

of corporate compliance monitors.  Exhibit A at 3.  The Morford Memorandum describes several

mechanisms to achieve the goals of independence and conflict-of-interest avoidance, including

2

the creation of a "standing or *ad hoc* committee" within DOJ and a reminder to those involved in the selection process that they must comply with DOJ's conflict-of-interest regulations.  Exhibit A at 4.  More specifically, the Morford Memorandum calls for the selection of monitors through the use of a candidate pool "of at least three qualified monitor candidates" whenever possible. *Id.*

8.      A separate memo, written by Assistant Attorney General Lanny Breuer of DOJ's Criminal Division and dated June 24, 2009, implemented the principles of the Morford Memorandum and laid out the monitor selection process with respect to any settlements reached by the Criminal Division, including those involving violations of the FCPA (the "Breuer Memorandum").  A true and correct copy of the Breuer Memorandum is attached hereto as **Exhibit C**.

9.      To better understand how DOJ applies the guidance provided in the Morford and Breuer Memoranda for purposes of my reporting for *Just Anti-Corruption*, on April 24, 2015, I sent a Freedom of Information Act ("FOIA") request to Ken Courter, Chief, FOIA/PA Unit, DOJ Criminal Division (the "First FOIA Request").  A true and correct copy of the First FOIA Request is attached as **Exhibit D**.  The First FOIA Request sought the following for fifteen (15) companies who entered into DPAs with DOJ related to FCPA violations in 2010–2014:

> (1) All documents submitted by counsel for the companies at the outset of each monitor selection process, including the names of up to three qualified monitor candidates whom the companies are allowed to recommend.  The information should identify which candidate, if any, the company specified as its first choice as monitor;

> (2) All Monitor Selection Memoranda, including any files, documents, and

       attachments therein, submitted for review to the Standing Committee on the

       Selection of Monitors.  To clarify, I'm seeking information about which monitors

       were approved or disapproved and the reasons therefore, including the

       recommendations submitted by the committee, the Assistant Attorney General for

       the Criminal Division, and the Office of the Deputy Attorney General; and

   (3)  Records of the Standing Committee, including its membership, attendance

       records, appointments of temporary designees, voting records and recusals in

       connection with the consideration of monitor candidates for each of the

       companies listed [herein].

10.     In the First FOIA Request, I requested a fee benefit as a representative of the

news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) and a fee waiver pursuant to 5 U.S.C. §

552(a)(4)(A)(iii).

11.     On May 1, 2015, I received a response from DOJ, a true and correct copy of

which is attached hereto as **Exhibit E**, stating that my Request presented "unusual

circumstances," and that it was therefore necessary to extend the time for DOJ to respond past

the 30 days set forth under FOIA.  The response indicated that "[i]n an effort to facilitate our

records search, you may wish to narrow the scope of your request to limit the number of

potentially responsive records[.]" *Id.* at 2.

12.     On June 23, 2015, I was contacted by Mr. Sprung via telephone regarding the

First FOIA Request.  Although Mr. Sprung was the main speaker, it is my understanding that at

least two other attorneys from his office were also on the phone.  At this time, I was not

represented by counsel.  During this phone call, Mr. Sprung said that he was reaching out to

"manage my expectations" and open up a conversation about how to move forward with the

4

request.  Mr. Sprung speculated that, among other potential exemptions, FOIA Exemptions 5 and 6 would likely be asserted by DOJ as a basis for withholding documents responsive to the First FOIA Request.  He also indicated that the collection and processing of documents responsive to my Request would take a considerable amount of time.  He said that DOJ would pull the responsive documents, but that he expected that the bulk of the information I requested would be withheld.  My impression from the telephone discussion with Mr. Sprung was that he wanted me to narrow the scope of my request.

13.     After consulting with my editor, Mary Jacoby, I arranged another telephone conference with Mr. Sprung on August 11, 2015 to discuss the exemptions that Mr. Sprung told me he anticipated DOJ would assert in response to the First FOIA Request.  Ms. Jacoby was also on this call.  I was still unrepresented by counsel at the time.  During the August 11, 2015 telephone call, Mr. Sprung reiterated that DOJ would likely assert Exemption 5 as a basis for withholding documents responsive to the First FOIA Request.  When pressed, Mr. Sprung agreed with Ms. Jacoby, however, that Exemption 5 would likely not be a justification for withholding the names of the monitor candidates.  He also said that I may have a reasonable argument for obtaining the names of the law or consulting firms of the monitor candidates, but that he believed that privacy exemptions (in particular, Exemption 6) could be asserted as a justification for withholding the names of the individual monitor candidates.  As with the June 23, 2015 phone call, my impression from this discussion was that Mr. Sprung wanted me to narrow the scope of my Request.

14.     Based on these two discussions with Mr. Sprung, I believed that DOJ would attempt to withhold a large number of documents responsive to my First FOIA Request.  Further,

based on these two discussions with Mr. Sprung, I felt that I would not get materials responsive to my First FOIA Request without narrowing its scope.

15.     As a direct result of these conversations with Mr. Sprung, on August 11, 2015, via an e-mail sent on my behalf by my editor, Ms. Jacoby, to Mr. Sprung, I offered to narrow the First FOIA Request to focus on the following:

> (1) the names of up to three monitor candidates and their associated law or consulting firms submitted to the DOJ by the defendant corporations under the terms of their negotiated resolutions; and
>
> (2) the names and titles of members of the Criminal Division's Standing Committee on the Selection of Monitors for the period of January 1, 2009 to the present, along with their dates of service.

A true and correct copy of the First FOIA Request, as narrowed, is attached as **Exhibit F**.

16.     In the August 11, 2015 e-mail, Ms. Jacoby explained that we did not agree with Mr. Sprung's assertions that Exemptions 5 and 6 would allow DOJ to withhold the names of corporate compliance monitor candidates, stating that "[w]e argue respectfully that the privacy exemption applies only to the release of personal information, such as medical or personnel records, and not to the names of professionals or their firms under consideration for the award of a lucrative government-mandated business contract."  Further, the e-mail stated that "[w]hatever potential 'embarrassment' an attorney who was not selected to be a monitor may feel by disclosure under FOIA is outweighed by the strong public interest in knowing that companies are complying with the spirit of their negotiated criminal resolutions by submitting monitor candidates who are qualified and conflict-free."  *Id.*

17.     On October 2, 2015, it is my understanding that Ms. Jacoby had another telephone conversation with Mr. Sprung about the First FOIA Request.  During this call, Mr. Sprung reiterated that Exemptions 5 and 6 would likely still be asserted by DOJ as justification for withholding material responsive to my Request, despite my narrowing of the Request.  I described this discussion in a November 10, 2015 letter to Ken Courter, Chief, FOIA/PA Unit, DOJ Criminal Division, in which I stated that "[m]ore than 180 days have elapsed since our FOIA request was first submitted" and requested that "the division provide a formal response to our FOIA, in writing, so that we may take the appropriate steps to respond to the issues that have been raised."  A true and correct copy this letter is attached hereto as **Exhibit G.**

18.     On December 15, 2015, I spoke with Mr. Sprung by telephone.  He told me that he was still working on a response to the First FOIA Request.  He also informed me that he was required, pursuant to Executive Order 12,600 and the DOJ's FOIA regulation 28 C.F.R. § 16.8, to notify the 15 companies I identified in the First FOIA Request prior to releasing any responsive records to me, in order to give the companies an opportunity to object to disclosure.

19.     It is my understanding that on January 13, 2016, Mr. Sprung notified corporations identified in my First FOIA Request that "[t]he requester subsequently agreed to narrow the scope of the request to cover, among other things, names and associated law or consulting firms of the three candidates submitted by your company as part of the negotiated resolution of the criminal case" and provided companies with the opportunity to object to disclosure.  A true and correct copy of the letter sent by DOJ to the 15 companies, which was automatically forwarded to me by DOJ, is attached hereto as **Exhibit H**.

20.     On February 2, 2016, I spoke with Benjamin Gruenstein, a partner at Cravath, Swaine & Moore LLP and counsel for Avon Products, Inc. ("Avon"), by telephone.  Avon is one

of the companies identified in my First FOIA Request.  During the call, Mr. Gruenstein agreed to

voluntarily provide the name of Avon's FCPA monitor and his firm affiliation, well as the names

of the two other monitor candidates and their firm affiliations, as Avon would not be asserting

that this information is confidential business information.

21.     On February 3, 2016, Mr. Gruenstein memorialized this conversation in a letter to

Mr. Courter, in which he informed DOJ that "Avon is not asserting that [the information

requested in the First FOIA Request, as narrowed] is confidential business information."  Mr.

Gruenstein copied me in an e-mail to Mr. Courter, in which the letter was attached.  A true and

correct copy of the letter is attached hereto as **Exhibit I**.

22.     On February 24, 2016, I sent an e-mail to Mr. Sprung asking for an update on the

status of the First FOIA Request.  I wrote that "we narrowed the request to help ensure that it's

both easy to produce and undeniably responsive."  A true and correct copy of that e-mail is

attached hereto as **Exhibit J**.

23.     On March 30, 2016, I again spoke with Mr. Sprung by telephone.  Mr. Sprung

told me that of the 15 companies named in the First FOIA Request, all had objected to the

disclosure of information responsive to the Request, with the exception of Avon.

24.     On April 12, 2016, I sent a FOIA request to Amanda Marchand Jones, Acting

Chief, FOIA/PA Unit, DOJ Criminal Division (the "Second FOIA Request").  A true and correct

copy of the Second FOIA Request is attached hereto as **Exhibit K**.  The Second FOIA Request

sought "the statements that companies provided to the department in response to [the First FOIA

Request]."

25.     In the Second FOIA Request, I requested a fee benefit as a representative of the

news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii) and a fee waiver pursuant to 5 U.S.C. §

552(a)(4)(A)(iii).

26.     By letter dated April 18, 2016, the DOJ acknowledged receipt of the Second

FOIA Request.  A true and correct copy of this letter is attached hereto as **Exhibit L**.

27.     On March 29, 2016, I e-mailed Ms. Jones, Acting Chief, FOIA/PA Unit, DOJ

Criminal Division, to inquire about the status of the First FOIA Request.  In the e-mail, I wrote

that I "filed my initial request over 11 months ago … and have yet to receive any responsive

information or even a formal reply from the FOIA unit."  Further, I wrote that "since January,

Mr. Sprung has failed to reply to repeated inquiries as to the status of the request."  A true and

correct copy of that e-mail is attached hereto as **Exhibit M**.

28.     On May 26, 2016, attorney Alison Schary of Davis Wright Tremaine LLP sent a

letter to the Criminal Division's FOIA unit on my behalf to inquire about the status of the First

FOIA Request.  A true and correct copy of the letter is attached hereto as **Exhibit N**.

29.     It is my understanding that Ms. Schary spoke with Mr. Sprung on June 9, 2016.

According to a summary of the call that Ms. Schary sent me, Mr. Sprung told her that he was

"hopeful" that he could provide a final written determination about my First FOIA Request

within a week, and agreed to provide the letters requested by my Second FOIA Request.  In

addition, based on the summary of the call that Ms. Schary sent me, Mr. Sprung told her that in

addition to the notification letters sent to the 15 companies pursuant to Executive Order 12,600

and the DOJ's FOIA regulation 28 C.F.R. § 16.8, DOJ had also sent similar notification letters to

the individuals nominated for corporate compliance monitor positions for these 15 companies.

Though it is my understanding that these letters should have been automatically forwarded to me

by DOJ, I never received them.

30.     I received no response to either the First FOIA Request or the Second FOIA

Request, nor any further communication from Mr. Sprung or anyone else at DOJ regarding those requests, prior to filing the Complaint in this matter on December 9, 2016.

31.     Prior to the filing of this lawsuit, I did not receive a formal determination from DOJ on the First FOIA Request or the Second FOIA Request.

32.     Prior to the filing of this lawsuit, I did not receive formal determinations on my requests for a fee benefit as a representative of the news media pursuant to 5 U.S.C. § 552(a)(4)(A)(ii), or my requests for fee waivers pursuant to 5 U.S.C. § 552(a)(4)(A)(iii).  No records were produced to me prior to the filing of this lawsuit.

33.     After I filed this lawsuit, DOJ produced a table by letter dated January 24, 2017 that contained information responsive to my First FOIA Request, as narrowed, with certain information withheld under assertions of Exemptions 6 and 7(C).

34.     Upon review of the table, I noticed several inaccuracies.  For example, the entry related to Innospec, Inc. ("Innospec") indicated that F. Joseph Warin of Gibson, Dunn & Crutcher LLP had been selected as corporate compliance monitor.  Based on responses to earlier FOIA requests by *Just Anti-Corruption*, as well as my own reporting, I understood that Kevin Abikoff of Hughes Hubbard & Reed was the monitor selected for Innospec.  In addition, the entry related to BAE Systems, Inc. ("BAE Systems") indicated that there was only one corporate compliance monitor nominated for the position, despite publicly-filed court documents indicating that there were at least six nominees prior to the selection of the corporate compliance monitor.  The date listed for the recommendation of BAE Systems's monitor also appeared to be inaccurate.

35.     The same day I received the table, I spoke with Mr. Sprung by telephone to inform him of the inaccuracies.  He indicated that DOJ would review the table for inaccuracies

and release a revised table, if necessary.  I also informed my counsel with the Reporters

Committee for Freedom of the Press of the inaccuracies I had identified.

36.     I received a revised table by letter dated April 14, 2017.

37.     Prior to DOJ's release of the table, I did not know that DOJ was going to provide

a table in lieu of records responsive to my First FOIA Request, as narrowed.  In addition, the

information that DOJ redacted from the table went to the heart of my FOIA request.  I submitted

the Request to gain a better understanding of how DOJ applies the guidance provided in the

Morford and Breuer Memoranda; without understanding who had been nominated (but not

ultimately selected) for a monitor role, I have no way of understanding if the DOJ is following its

own guidance in the monitor selection process (for example, without the candidate names I have

no way of telling if DOJ is properly screening for conflicts of interest).  Further, without the

names of the monitor candidates, the public is without key information regarding DOJ's

enforcement of its anti-corruption laws.

38.     On April 14, 2017, I spoke with Jennifer Nelson, attorney at the Reporters

Committee for Freedom of the Press and of counsel in this litigation, about what I believed to be

additional and remaining inaccuracies in the revised table produced by DOJ.  In particular, the

table entry related to BAE Systems in the revised table continued to indicate that there was only

one corporate compliance monitor nominated for the position.  In addition, according to the

revised table produced by DOJ, the date the Deputy Attorney General adopted the

recommendation of the Assistant Attorney General for the Universal Leaf monitorship was

February 12, 2013, despite publicly-available information that indicated the deferred prosecution

agreement for Universal Leaf was signed in August 2010.

39.     Per my understanding, Ms. Nelson e-mailed DOJ counsel on April 17, 2017 who

indicated that DOJ would produce a revised table on or before DOJ filed its motion for summary judgment in this matter.

40.     On July 10, 2017, counsel for DOJ produced a "corrected" table responsive to my First FOIA Request.  Though I do not recognize any obvious errors in this latest version of the table, I have no way of knowing that this table is accurate.

41.     The accompanying letter states that "the table released on January 27, 2017, incorrectly identified F. Joseph Warin as the monitor for Innospec, Inc. (Innospec).  He was not the monitor and his name has been removed from the corrected table."  A true and correct copy of the letter, which was provided to me by counsel, is attached hereto as **Exhibit O**.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on August 23, 2017.

Dylan Tokar