# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

DYLAN TOKAR,                              :
                                         :
    Plaintiff,            :    Civil Action No.:     16-2410 (RC)
                                         :
    v.                    :    Re Document No.:    9, 10
                                         :
U.S. DEPARTMENT OF JUSTICE,               :
                                         :
    Defendant.            :

## MEMORANDUM OPINION

### GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

This case arises from two Freedom of Information Act ("FOIA") requests to the Criminal

Division of the U.S. Department of Justice ("DOJ"). Dylan Tokar, a reporter for the publication

*Just Anti-Corruption*, which covers investigations and prosecutions under the Foreign Corrupt

Practices Act ("FCPA"), sought records regarding the selection of corporate compliance

monitors for fifteen corporations that had resolved their FCPA cases through deferred

prosecution agreements ("DPA"). Following discussions with a DOJ attorney, during which Mr.

Tokar was warned that DOJ would likely attempt to withhold documents responsive to his first

FOIA requests under several FOIA exemptions, Mr. Tokar narrowed his request in an attempt to

speed up the production process. Four months after Mr. Tokar narrowed his request, DOJ

informed Mr. Tokar that, pursuant to 28 C.F.R. § 16.8(f), DOJ would need to send notifications

to the fifteen corporations identified in his FOIA request in order to give them an opportunity to

object to DOJ's proposed disclosures. Following the dispatch of these "submitter notification"

letters, Mr. Tokar submitted a second FOIA request seeking the disclosure of any objection

letters the fifteen corporations submitted in response to the notifications. After months without a

production in response to either FOIA request, Mr. Tokar filed this suit. DOJ's ultimate

responses to Mr. Tokar's FOIA requests—a table with the information he sought through his first

request, and copies of the letters he sought through his second—contained multiple redactions.

DOJ moved for summary judgment following these releases, and Mr. Tokar cross-moved for

summary judgment, challenging the majority of DOJ's redactions. For the reasons set forth

below, the Court finds that each of DOJ's redactions under Exemptions 6 and 7(C) were

improper, but that its redaction pursuant to Exemption 4, which Mr. Tokar did not challenge, was

permissible.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

Journalist Dylan Tokar, of the trade publication *Just Anti-Corruption*, has filed two FOIA

requests seeking records and information related to DOJ's selection process for corporate

compliance monitors in FCPA cases. Corporate compliance monitors are hired at the expense of

a company under DOJ scrutiny and are typically responsible for  "(1) investigating the extent of

wrongdoing already detected and reported to the government; (2) discovering the cause of the

corporation's compliance failure; and (3) analyzing the corporation's business needs against the

appropriate legal and regulatory requirements." Veronica Root, *The Monitor-"Client"*

*Relationship*, 100 Va. L. Rev. 523, 531 (2014). Following public controversy regarding the

selection of monitors, DOJ launched an inquiry into its monitor selection process and issued the

"Morford Memorandum," which formally established principles for monitor selection. *See* Pl.'s

Mem. L. Opp'n Def.'s Mot. Summ. J. & Supp. Pl.'s Cross-Mot. Summ. J. ("Pl.'s Mem.") at 5,

ECF No. 10-1. According to Mr. Tokar, the memorandum "lays out several mechanisms to

achieve the goals of independence and avoidance of conflict-of-interest, including the creation of

a 'standing or *ad hoc* committee' within DOJ and a reminder to those involved in the selection process that they must comply with DOJ conflict-of-interest regulations." *Id.* (internal citation omitted). "More specifically, the Morford Memorandum calls for the selection of monitors through the use of a candidate pool 'of at least three qualified monitor candidates' whenever possible." *Id.*

As a reporter focused on FCPA enforcement, Mr. Tokar is interested in obtaining records from DOJ that he claims "would shed light on [corporate compliance monitor selection], including whether DOJ [is] abiding by the principles for monitor selection set forth in the Morford Memorandum." *Id.* at 6. Accordingly, he submitted a FOIA request on April 24, 2015 seeking "copies of records relating to the review and selection of independent corporate monitors under Foreign Corrupt Practices Act (FCPA) settlement agreements between the Justice Department and [fifteen specific][1] corporate defendants," including:

1. All documents submitted by counsel for the companies at the outset of each monitor selection process, including the names of up to three qualified monitor candidates whom the companies are allowed to recommend. The information should identify which candidate, if any, the company specified as its first choice to serve as monitor.

2. All Monitor Selection Memoranda, including any files, documents and attachments therein, submitted for review to the Standing Committee on the Selection of Monitors . . . [specifically] information about which monitors were approved or disapproved and the reasons therefore, including the recommendations submitted by the committee, the Assistant Attorney General for the Criminal Division, and the Office of the Deputy Attorney General.

---

[1] The fifteen corporations listed were; Alcatel-Lucent, S.A.; Alliance One International AG; Alstom S.A.; Avon Products, Inc.; BAE Systems plc; Bilfinger SE; Biomet Inc.; Daimler AG; Diebold Inc.; Innospec Inc.; JGC Corporation; Smith & Nephew, Inc.; Technip S.A.; Universal Corporation; and Weatherford International Ltd. *See* Compl., Ex. 1, ECF No. 1-1.

    3.  Records of the Standing Committee, including its membership,
attendance records, appointments of temporary designees,
voting records and recusals in connection with the consideration
of monitor candidates for each of the companies listed below.

Compl., Ex. 1, ECF No. 1-1. During the summer of 2015, Mr. Tokar spoke on the phone several

times with DOJ attorney Peter Sprung, who warned Mr. Tokar that he believed that several

FOIA exemptions would be asserted as to the documents he had requested, and therefore that

several of those documents would be withheld. *See* Pl.'s Statement of Material Facts ("Pl.'s

SMF") ¶¶ 23–27, ECF No. 10-2. Based on these conversations, Mr. Tokar grew worried that he

would not be given documents responsive to his first FOIA request unless he narrowed its scope.

Decl. Dylan Tokar ("Tokar Decl.") ¶¶ 12–14, ECF No. 10-3.

      Therefore, Mr. Tokar and his editor, Mary Jacoby, agreed to "narrow [the] request" to the

following for the fifteen corporate defendants named in the original FOIA request:

    1.  The names of the up to three monitor candidates and their
associated law or consulting firms submitted to the [d]epartment
by the defendant corporations under the terms of their negotiated
resolutions.

    2.  The names and titles of members of the Criminal Division's
Standing Committee on the Selection of Monitors for the period
Jan. 1, 2009 up through the present date. Along with the names
of the members of the committee, please give their dates of
service . . . [and] the names of any temporary designees
appointed to the committee and the dates of their service.

Compl., Ex. 2, ECF No. 1-2. Even after narrowing the scope of his request, however, Mr. Tokar

did not receive a speedy response. In the fall of 2015, Mr. Tokar and Ms. Jacoby reached out to

DOJ on two occasions, reminding them that they had still not received a response to Mr. Tokar's

FOIA request. *See* Pl.'s SMF ¶ 31–32; Tokar Decl. ¶ 17.  Then, in December 2015, Mr. Sprung

informed Mr. Tokar that DOJ would be notifying the fifteen companies of Mr. Tokar's FOIA

request and would give the companies a chance to object to the release of the requested

information, pursuant to Executive Order 12,600 and 28 C.F.R. § 16.8. *See* Tokar Decl. ¶ 18.

Ultimately, fourteen companies leveled some sort of objection to the release of the information

in Mr. Tokar's FOIA request. *See* Tokar Decl. ¶ 23.

On April 12, 2016, Mr. Tokar submitted a second FOIA request to DOJ seeking "copies

of [the] 28 C.F.R. § 16.8(f) statements submitted by companies in connection with [the] previous

FOIA request." Compl., Ex. 7, ECF No. 1-7. Eight months later, Mr. Tokar still had not received

responses to either FOIA request, and therefore, on December 9, 2016, he filed suit in this Court.

*See* Compl.

Six weeks after Mr. Tokar filed his complaint, DOJ provided him with what it considered

to be a response to his first FOIA request: a table containing the information listed in Mr.

Tokar's narrowed FOIA request, with certain information—the names of the monitor candidates

who were nominated but not selected, the firms these candidates worked for if those firms were

small, and the names of two members of the DOJ Standing Committee—redacted pursuant to

FOIA Exemptions 6 ("personnel and medical files and similar files") and 7(C) ("records or

information compiled for law enforcement purposes, but only to the extent that the production of

such law enforcement records or information . . . could reasonably be expected to constitute an

unwarranted invasion of personal privacy"). *See* Def.'s Statement of Material Facts ("Def.'s

SMF") ¶ 8, ECF No. 9; 5 U.S.C. § 552(b)(6), (7)(C). DOJ had to issue amended versions of this

table twice after Mr. Tokar identified errors within it. *See* Pl.'s SMF ¶¶ 46–51.

In the summer of 2017, DOJ provided Mr. Tokar with copies of the response letters that

he had sought in his second FOIA request, with certain information withheld pursuant to FOIA

Exemptions 4 ("trade secrets and commercial or financial information obtained from a person

and privileged or confidential"), 6, and 7(C), though the agency ultimately concluded that

Exemption 7(C) did not apply to these letters. *See* Decl. Peter C. Sprung ("Sprung Decl.") ¶ 23, ECF No. 9-2. DOJ not only again withheld the names of the monitor candidates who had not been selected, but it also withheld the names of the private attorneys who had responded to the notices on behalf of their corporate clients and the name of two DOJ employees who dealt with the submitter notice process. *See* Sprung Decl. ¶ 30. Following these releases, the parties cross-moved for summary judgment. Their motions are now ripe for decision.

### III.  LEGAL STANDARD

A court may grant a motion for summary judgment when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). A "material" fact is one that "might affect the outcome of the suit under the governing law." *Id.* at 248. Once the moving party has demonstrated the absence of a genuine dispute of material fact, the non-moving party may not simply rely on the allegations in its pleadings, and must present more than "a scintilla of evidence" to support its factual assertions. *Id.* at 252.

In reviewing a motion for summary judgment under the FOIA, the district court conducts a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). In a FOIA action in which the sufficiency of a search is challenged, a defendant agency must demonstrate "beyond material doubt [] that it has conducted a search reasonably calculated to uncover all relevant documents" in order to succeed on summary judgment. *Morley v. CIA*, 508 F.3d 1108, 1114 (D.C. Cir. 2007) (alteration in original) (internal citation and quotation marks omitted). The agency also carries the burden of demonstrating that any responsive records that were not provided were properly withheld pursuant to one of nine express statutory exemptions. *Citizens for Responsibility and Ethics in Washington v. U.S. Dep't of Justice*, 746 F.3d 1082, 1088 (D.C. Cir. 2014). The agency

may carry that burden by submitting affidavits that "'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'" *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (quoting *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984)). It is not sufficient for the agency to provide "vague, conclusory affidavits, or those that merely paraphrase the words of a statute . . . ." *Church of Scientology of Cal., Inc. v. Turner*, 662 F.2d 784, 787 (D.C. Cir. 1980). When an agency invokes an exemption, "it must submit affidavits that provide 'the kind of detailed, scrupulous description [of the withheld documents] that enables a District Court judge to perform a de novo review.'" *Brown v. FBI*, 873 F. Supp. 2d 388, 401 (D.D.C. 2012) (quoting *Church of Scientology*, 662 F.2d at 786) (alternation in original). Agency affidavits sometimes take the form of a *Vaughn* index, *see Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973), but there is "no fixed rule" establishing what such an affidavit must look like, *ACLU v. CIA*, 710 F.3d 422, 432 (D.C. Cir. 2013). "[I]t is the function, not the form, of the index that is important." *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 349 (D.C. Cir. 1987).

## IV.  ANALYSIS

DOJ has moved for summary judgment regarding its responses to Mr. Tokar's FOIA requests. DOJ first claims that Mr. Tokar's first request, as narrowed, was a request for information, rather than documents, and therefore that the agency's response to that narrowed request (a table) was an act of agency grace because DOJ was not "obligated to conduct a search for responsive documents in the ordinary sense." Def.'s Mem. Supp. Def.'s Mot. Summ. J. ("Def.'s Mem.") at 3, ECF No. 9. It further argues that not only has it demonstrated that its search in response to the request was adequate, but also that its redactions to the table under

FOIA Exemptions 6 and 7(C) were lawful. Additionally, DOJ argues that it has sufficiently shown that its redactions to the response letters under FOIA Exemptions 4 and 6 were permissible. Mr. Tokar counters that his narrowed FOIA request was a request for documents, not information, and now requests that DOJ turn over the documents that it used to make its table. Additionally, he claims that DOJ's redactions to the documents released in response to his first and second requests pursuant to Exemptions 6 and 7(C) were impermissible. However, he does not object to DOJ's single redaction pursuant to Exemption 4. For the reasons set forth below, the Court finds that Mr. Tokar's narrowed request should have been interpreted as a request for documents, not simply information, given that his original request was a similarly worded request for both documents and information. It further finds that DOJ's redactions pursuant to Exemptions 6 and 7(C) were impermissible, but affirms DOJ's decision to redact several paragraphs of text pursuant to Exemption 4.

## A. Narrowing of the First FOIA Request

This case presents an uncommon situation, in which a request for a wide array of documents was narrowed to a request for the disclosure for certain information, rather than specific, identified documents—information that the requester would have had access to if he had received the documents he had initially sought through the request that the defendant agency had encouraged him to narrow. Therefore, in adjudicating these motions for summary judgment, the Court must first determine the legal effect of the narrowing of Mr. Tokar's first FOIA request. DOJ claims that the language in the email in question "narrowed [Mr. Tokar's] request in a manner that no longer sought the release of the actual documents identified in the original request, but instead sought only certain information with regard to the 15 FCPA matters identified in his original request." Def.'s SMF ¶ 3. DOJ therefore claims that Mr. Tokar's

narrowing was not a legitimate FOIA request, because FOIA requests must seek documents, not simply information. *See* Def.'s Mem. at 3. It backs up this claim with a follow-up email Mr. Tokar sent five months after the narrowing of his request, in which he reiterated that he had narrowed his request so that he was "merely asking for (1) [t]he names and law firm affiliations of the three monitor candidates put forth by each company on our list [and] (2) [t]he names and titles of members of the Standing Committee on the Selection of Monitors, including their dates of service and any temporary designees." Def.'s SMF ¶ 5 (citing Compl., Ex. 6, ECF No. 1-6) (alternations in original). DOJ claims that "because Plaintiff's narrowed request did not seek underlying documents but instead certain information, DOJ reasonably responded to the FOIA request by creating a table that contained the requested information." *Id.* ¶ 6. Mr. Tokar responds that his request was a proper FOIA request seeking documents, as evidenced by the fact that his narrowed request was an alteration of a clearly permissible FOIA request that had sought documents, as well as the fact that DOJ categorized his narrowed request as a FOIA request with a unique FOIA request case number. Additionally, Mr. Tokar believes that the Court should credit his good faith attempt to narrow his FOIA request and imply from the narrowing of his request that he was seeking records that reflected a narrower scope of information than that in his original request. *See* Pl.'s Mem. at 12–14, ECF No. 10-1. Mr. Tokar is correct that DOJ should have construed his narrowed request as a request for the documents containing the information he sought.

FOIA requests must "reasonably describe[]" the records sought. 5 U.S.C. § 552(a)(3)(A). In determining whether a request reasonably describes the records sought, courts should consider whether the request would allow agency staff to determine precisely which records are being requested and to locate them. *See Yeager v. Drug Enf't Admin.*, 678 F.2d 315, 326 (D.C. Cir.

1982). Agencies are not required to "dig out all the information that might exist, in whatever form or place it might be found, and to create a document that answers plaintiff's questions." *Frank v. U.S. Dep't of Justice*, 941 F. Supp. 4, 5 (D.D.C. 1996). Normally, an agency "is not obliged to look beyond the four corners of the request . . . ." *Kowalczyk v. Dep't of Justice*, 73 F.3d 386, 389 (D.C. Cir. 1996). However, agencies have a duty to "construe a FOIA request liberally." *LaCedra v. Exec. Office for U.S. Attorneys*, 317 F.3d 345, 348 (D.C. Cir. 2003) (quoting *National Magazine, Washington Bureau v. U.S. Customs Serv.*, 71 F.3d 885, 890 (D.C. Cir. 1995)) . Under DOJ's own regulations, if the component of DOJ that has received the request "determines that it does not reasonably describe the records sought, the component shall inform the requester what additional information is needed or why the request is otherwise insufficient." 28 C.F.R. § 16.3(b).

Generally, requests for information rather than records are not considered proper FOIA requests. *See Jean-Pierre v. Fed. Bureau of Prisons*, 880 F. Supp. 2d 95, 103–104 (D.D.C. 2012). FOIA "does not obligate agencies to create or retain documents; it only obligates them to provide access to those which it in fact has created and retained." *Kissinger v. Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 142 & n.7 (1980); *see also Rodriguez-Cervantes v. U.S. Dep't of Health & Human Servs.*, 853 F. Supp. 2d 114, 117 (D.D.C. 2012) ("As [plaintiff's] letters merely pose questions . . . or ask for assistance in applying for Social Security benefits, they do not constitute valid FOIA requests."); *Thomas v. Comptroller of the Currency*, 684 F. Supp. 2d 29, 33 (D.D.C. 2010) ("To the extent that plaintiff's FOIA requests were questions or requests for explanations of policies or procedures, these are not proper FOIA requests requiring the OCC's response.")

This case, however, is not a simple case in which an individual requested information instead of documents because the request being interpreted is the narrowing of a previous request that had unequivocally requested documents and specified the types of information the requester wanted to see in those documents. For example, Mr. Tokar requested "[a]ll documents submitted by counsel for the companies at the outset of each monitor selection process, including the names of up to three qualified candidates whom the companies are allowed to recommend." Compl., Ex. 1. The goal of this request was clear: Mr. Tokar wanted all of the documents submitted by counsel at the outset of the selection process, and wanted to emphasize that he was especially interested in obtaining documents that indicated which individuals each company nominated to serve as monitors. The two other types of documents he sought in his original request also included this linguistic mix of document and information request. *See id.*

Mr. Tokar's narrowed request asked for some of the exact same information he had asked for in his original request, but without the specification that the information be released in specific records. However, taking both requests together, it can be reasonably inferred that Mr. Tokar sought the same sort of documents in his narrowed request, and was simply informing DOJ that he no longer sought documents from the fifteen companies' attorneys or the standing committee that reflected other information not identified in the narrowed request. And indeed, given that the agency was already on notice of what Mr. Tokar was seeking from his previous request, DOJ, construing the narrowed request liberally, should have reasonably interpreted that Mr. Tokar was now seeking "documents submitted by counsel for the companies that indicated the names of up to three monitor candidates and their associate law firm consulting firms" and "records of the standing committee that indicate the names and titles of its members from January 1, 2009 to August 11, 2015, their dates of service, and the names of any temporary

designees to the committee and their dates of service," and was simply informing DOJ that he no longer sought documents from the fifteen companies' attorneys or the standing committee that reflected other information.  If DOJ could not reasonably interpret from Mr. Tokar's narrowed request what types of records or information he was seeking, it had a duty to confer with Mr. Tokar to clear up any confusion. *See* 28 C.F.R. § 16.3(b). In order to save the agency some time and provide Mr. Tokar the requested information in a more user-friendly format, the agency certainly could have reached an agreement with Mr. Tokar regarding his acceptance of a chart in lieu of the requested documents. But the record does not reflect that such an agreement was reached and the agency cannot unilaterally reinterpret the request in this fashion.

Accordingly, the Court finds that DOJ is required to search for and release to Mr. Tokar records submitted by the fifteen companies' attorneys that reflect "[t]he names of [] up to three monitor candidates and their associated law or consulting firms submitted to the [d]epartment by the defendant corporation under the terms of their negotiated resolutions," and standing committee records that reflect "[t]he names and titles of members of the Criminal Division's Standing Committee on the Selection of Monitors for the period Jan. 1, 2009 up through the present date," as well as those members' "dates of service . . . [and] the names of any temporary designees appointed to the committee and the dates of their service." Pl.'s Mot. Summ. J., Ex. F, ECF No. 10-9.[2]

---

[2] It is not clear to the Court that Mr. Tokar really wants the records or whether he will be content with an unredacted chart as ordered herein. *See* Pl.'s Mem. at 14 ("Although he did not agree to it, Plaintiff would have been satisfied with an accurate, unredacted table providing only the specific information that is the subject of his First FOIA Request, as narrowed, in lieu of responsive records."). Clearly, the Court does not wish to order the expending of additional agency resources in this case if the dispute at hand is solely one over principle, rather than documents. However, absent such an agreement regarding the sufficiency of the chart, the Court must order the search for and processing of the records.

### B.  Adequacy of the Search

When considering a motion for summary judgment in a FOIA case, courts have an independent duty to determine whether the agency's search for responsive records was adequate. *See Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 507–08 (D.C. Cir. 2016) (under the Federal Rules of Civil Procedure, a "District Court may enter summary judgment only if, after fully considering the merits of the [unchallenged] motion, it finds that it is warranted"). In order to be granted summary judgment, an "agency must demonstrate that it has conducted a search reasonably calculated to uncover all relevant documents." *Steinberg v. U.S. Dep't of Justice*, 23 F.3d 548, 551 (D.C. Cir. 1994) (internal citation and quotation marks omitted).

Mr. Tokar has not directly challenged the adequacy of DOJ's searches in response to either of his FOIA requests. Indeed, in response to his second FOIA request, DOJ was able to locate and produce each of the fifteen documents he requested. *See* Sprung Decl. ¶ 23. However, he does indirectly challenge the adequacy of the search for records that DOJ used to compile its table in response to his first request by pointing out that "Defendant has *twice* revised [the table] to correct errors, and Plaintiff has no way of knowing whether Defendant's now-third version of its table is accurate." Pl.'s Mem. at 2 (emphasis in original). Mr. Tokar now insists that he is entitled to copies of the actual documents responsive to his first FOIA request, and as this Court has explained, the agency is required to produce them.

Because DOJ has not yet produced to Mr. Tokar the documents responsive to his first FOIA request, the Court cannot yet determine the adequacy of its search. However, DOJ's description of the way it searched for documents that allowed it to create the table it released to Mr. Tokar appears to be a promising start. DOJ has explained its process of searching for records with information responsive to Mr. Tokar's first FOIA request as follows:

(1) we consulted with individuals in the Fraud Section of the Criminal Division who had knowledge of the subject matter of the request; (2) we identified the custodians of records involving DOJ's review and selection of the monitors in the 15 FCPA matters in question; (3) we determined that there was no single document that listed the information Plaintiff was requesting; (4) upon devising appropriate search parameters, we searched the custodians' email accounts and obtained certain other relevant electronic and paper files; (5) we queried a correspondence tracking system maintained by the Office of the Assistant Attorney General for the Criminal Division ("AAG"); and (6) having obtained the necessary records and loaded the electronic records into a text searchable database, we reviewed the records and extracted the information necessary to prepare the table.

Sprung Decl. ¶ 9. Replicating this process should bring DOJ well on its way to adequately searching for responsive records and adequately responding to Mr. Tokar's FOIA request.

### C.  The Redactions

DOJ has redacted certain information contained in the table and response letters it released to Mr. Tokar under FOIA Exemptions 4, 6, and 7(C). From its response to Mr. Tokar's first FOIA request—a table which contained "the date the Deputy Attorney General ('DAG') approved the selection of the monitor candidate or other available information when the date of the DAG's approval was unknown, the names of the Standing Committee members, the name of any professional services firm with whom [] the nominee was associated, and the name of the appointed monitor," Sprung Decl. ¶ 10 (internal footnotes omitted)—DOJ redacted, pursuant to Exemptions 6 and 7(C), "the names of monitor selection committee members who are not part of DOJ's senior management" and "the names and related personal identifying information concerning the individuals nominated but not selected to be monitors." *Id.* ¶ 12. From its response to Mr. Tokar's second FOIA request—copies of the letters responding to DOJ's submitter notices—DOJ redacted, pursuant to Exemption 4, several paragraphs of text describing certain internal steps one of the companies, Daimler AG, took to evaluate and enhance its FCPA

compliance programs, as well as the names of the nominees who were not selected to be monitors, the names of private attorneys who responded to the submitter notices, and the names of two DOJ employees who either received the responses or handled the FCPA cases, all pursuant to Exemption 6. *Id.* ¶¶ 25–28, 30. Mr. Tokar does not challenge the redaction under Exemption 4,[3] but does challenge the redactions under Exemptions 6 and 7(C). For the following reasons, the Court finds that the redacted portions of the table and letters were not properly withheld pursuant to Exemptions 6 and 7(C), and therefore must be released.

---

[3] Although Mr. Tokar has not challenged DOJ's withholding pursuant to Exemption 4, the Court still has an independent duty to "determine for itself whether the record and any undisputed material facts justify granting summary judgment," because a Court may not grant summary judgment simply because the withholding was not challenged. *See Winston & Strawn, LLP*, 843 F.3d at 505 (citing *Grimes v. District of Columbia*, 794 F.3d 83, 97 (D.C. Cir. 2015) (Griffith, J., concurring)). Under FOIA Exemption 4, agencies may withhold "trade secrets and commercial or financial information obtained from a person and privileged or confidential." 5 U.S.C. § 552(b)(4). The terms "'commercial' and 'financial' in the exemption should be given their ordinary meanings." *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). DOJ claims that the redacted text, which "describes certain internal steps Daimler [AG] took to evaluate and enhance its FCPA compliance programs," is "'commercial' within the meaning of Exemption 4, because it serves a commercial function and is of a commercial nature, and Daimler has a commercial interest in the information in that it is helpful or instrumental to its business interest." Sprung Decl. ¶¶ 25, 27. Courts in this circuit have previously found information about "the way [] companies implement their compliance programs" is "sufficiently 'instrumental' to the companies' operations to qualify as 'commercial.'" *Public Citizen v. U.S. Dep't Health & Human Servs.*, 66 F. Supp. 3d 196, 208 (D.D.C. 2014); *see also 100Reporters LLC v. U.S. Dep't of Justice*, 248 F. Supp. 3d 115, 137 (D.D.C. 2017). As such, the Court finds that the information regarding Daimler's FCPA compliance that the company shared with DOJ when responding to the submitter notice was "commercial" within the meaning of Exemption 4.

DOJ also claims that the information is confidential because it was submitted to the agency voluntarily and is a type of information that is not usually released to the public. *See* Def.'s Mem. at 13 (citing *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992)); *see also* Sprung Decl. ¶ 28. The Court has no reason to disbelieve this assertion. Because the agency has submitted an affidavit that reasonably describes how this information meets all of the requirements of Exemption 4, the Court finds that DOJ's redaction of this information was permissible.

### 1.  The Unselected Candidates

DOJ originally redacted from the table it supplied to Mr. Tokar in response to his first FOIA request "the names of monitor selection committee members who are not part of DOJ's senior management" and "the names and related personal identifying information concerning the individuals nominated but not selected to be monitors." Sprung Decl. ¶ 12. [4] It also redacted the names of the unselected nominees when those names appeared in a company's response letter to its submitter notice. *See generally* Def.'s Mot., Ex. A, ECF No. 9-2. In the case of the table, DOJ claims that these names were properly withheld pursuant to Exemptions 6 and 7(C) because the records the names were extracted from were "compiled for law enforcement purposes" and their release would constitute an invasion of those individuals' privacy. Def.'s Mem. at 4; *see also* Def.'s Reply at 5 n.1, ECF No. 13. In the case of the response letters, it originally supported its redactions by citing to Exemptions 6 and 7(C), but has since conceded that 7(C) is not applicable to these letters, as they were not compiled for a law enforcement purpose. Def.'s SMF ¶ 14.

DOJ has since released the names of every individual on the monitor selection committee to Mr. Tokar. *See* Def.'s Reply, Suppl. Sprung Decl. ¶ 7, ECF No. 13-2; Def.'s Reply, Suppl. Sprung Decl., Ex. A, ECF No. 13-2. Therefore, the Court need only determine whether DOJ's decision to withhold from the table and the letters the names of the individuals nominated but not selected to be monitors, as well as their firms when those firms are small, was permissible under either Exemption 6 or 7(C). [5] *See* Def.'s Reply at 6. DOJ argues that releasing the names of these

---

[4] The "related personal identifying information" that DOJ alludes to is "the name[] of any professional services firm with whom an unsuccessful nominee was associated . . . where disclosure would enable the unsuccessful nominee to be identified" because "the nominee was associated with a firm employing [fewer] than 10 attorneys or the firm was a sole proprietorship." Sprung Decl. ¶ 17.

[5] While the Court has ruled that DOJ's attempt to answer Mr. Tokar's request for documents with a table was not permissible, the Court will still address the question of whether,

individuals, or the release of information that would allow the public to identify them, would be an "unwarranted invasion of personal privacy." Def.'s Mem. at 6. Mr. Tokar argues in response that "DOJ has failed to show that these individuals have any privacy interest, let alone a substantial one, that would outweigh the significant public interest in this information." Pl.'s Mem. at 16. The Court concludes that while DOJ has demonstrated that these individuals have more than a *de minimis* privacy interest in their anonymity, the public interest in learning these individuals' identities outweighs that privacy interest, and therefore, the individuals' names and firms must be released.

Under Exemption 6, an agency may withhold "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "Similar files" has a "broad, rather than narrow meaning," *U.S. Dep't of State v. Wash. Post Co.*, 456 U.S. 595, 600 (1982), and has been interpreted to include "personal information in public records." *Nat'l Ass'n of Retired Fed. Emps. v. Horner*, 879 F.2d 873, 875 (D.C. Cir. 1989). When evaluating withholdings under Exemption 6, there is a

---

now that DOJ has created and released this record, its attempt to redact information pursuant to Exemptions 6 and 7(C) were permissible. While DOJ has never explicitly conceded that it believed the table was responsive to Mr. Tokar's FOIA request, it did release the table "in a good faith effort to respond to the narrowed request" for information. Sprung Decl. ¶ 9. While the D.C. Circuit has yet to deal "with the precise question of how it should treat an erroneous redaction made within a non-responsive document that the agency originally classified as responsive, [it] has held that 'under [FOIA's] statutory framework, once the government concludes that a particular record is responsive to a disclosure request, the sole basis on which it may withhold particular information within that record is if the information falls within one of the statutory exemptions from FOIA's disclosure mandate.'" *Wallick v. Agric. Mktg. Serv.*, 281 F. Supp. 3d 56, 77 (D.D.C. 2017) (quoting *Am. Immigration Lawyers Ass'n v. Exec. Office for Immigration Review*, 830 F.3d 667, 670 (D.C. Cir. 2016)). Because DOJ released this record "in a good faith effort to respond to the narrowed request," the Court will evaluate whether the information was permissibly redacted from the document. The same analysis regarding Exemptions 6 and 7(C) will apply to the documents DOJ releases in response to Mr. Tokar's first FOIA request in compliance with this opinion.

"presumption in favor of disclosure [that] is as strong as can be found anywhere in the Act."

*Multi Ag Media LLC v. U.S. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation

omitted). Therefore, an agency may withhold personal information only if "disclosure would

compromise a substantial, as opposed to a *de minimis*, privacy interest." *Horner*, 879 F.2d at

874.

When a "substantial" privacy interest is at stake, the Court must "balance the individual's

right of privacy against the basic policy of opening agency action to the light of public scrutiny."

*Nat'l Ass'n of Home Builders v. Norton*, 309 F.3d 26, 32 (D.C. Cir. 2002) (citation and internal

quotation marks omitted). The Supreme Court has held that the only public interests relevant to

the Exemption 6 analysis are those that "contribut[e] significantly to public understanding of the

operations or activities of the government." *U.S. Dep't of Def. v. Fed. Labor Relations Auth.*, 510

U.S. 487, 495 (1994) (internal citation and quotation marks omitted)). In other words,

"information about private citizens that is accumulated in various governmental files but that

reveals little or nothing about an agency's own conduct" is not the type of information to which

FOIA permits access. *Id.* at 496 (citations and internal quotation marks omitted).

As such, the Court must first decide whether the unselected candidates have a privacy

interest in their continued anonymity. DOJ claims that it redacted the names of unselected

candidates because the release of those names could cause "harm or embarrassment." Def.'s

Mem. at 7. It analogizes to a case in which this Court found that the names of two individuals

being considered to serve as the next Director of the Bureau of Prisons, as well as their

professional qualifications and official biographies, could be properly redacted under Exemption

6 because the unselected "individual[s] [had] a considerable privacy interest in avoiding having

his or her non-selection disclosed to the public, a disclosure which would likely cause

embarrassment." *Pinson v. U.S. Dep't of Justice*, 202 F. Supp. 3d 86, 114 (D.D.C. 2016) (internal citation and quotation marks omitted). The Court found particularly relevant the fact that no evidence on the record had shown that the individuals had "affirmatively sought public office or bid to run BOP." *Id.* Therefore, the Court concluded "that a substantial privacy interest would be implicated by the disclosure of the information." *Id.* In this case, however, it bears mentioning that while it is possible that the revelation of non-selection would bring some embarrassment to the unsuccessful candidates, the names in question belong to individuals who presumably had already agreed to allow DOJ to consider their candidacies, and therefore the names do not appear in these responsive records through no fault of the candidates'.

Mr. Tokar also analogizes to a case from this District, in which a court found that individuals who had applied for executive clemency and had had their applications denied did not have a privacy interest in the mere fact that they had applied for, and been denied, that clemency. *See* Pl.'s Reply at 12, ECF No. 15 (citing *Lardner v. U.S. Dep't of Justice*, No. 03-180, 2005 WL 758267, at *16 (D.D.C. Mar. 31, 2005)). The court had found particularly important the distinction between the release of the fact that an individual applied for a pardon and the materials comprising the pardon application itself. *See Lardner*, 2005 WL 758267, at *16. However, the Court made an additional distinction that is relevant here: that in the case of pardon applications, "[t]he conviction that the pardon applicant is seeking to annul was itself public, and it cannot be thought that the information that the individual later was denied a pardon application adds much additional embarrassment beyond the original conviction." *Id.* at *17.

In this case, however, we are dealing with the privacy of individuals who, presumably, have not been publicly implicated in any previous wrongdoing. Rather, the privacy interests at stake are those of high-level professionals who were nominated, but not ultimately selected, to

participate in a lucrative contract. Whether the release of these names would cause the same level

of embarrassment as the release of the names of unsuccessful applicants for government jobs, as

was the case in *Neary v. FDIC*, 104 F. Supp. 3d 52 (D.D.C. 2015) (permitting withholding under

Exemption 6), or unsuccessful applicants for government grants and part-time appointments, as

in *Kurzon v. HHS*, 649 F.2d 65 (1st Cir. 1981) (not permitting withholding under Exemption 6)

and *Physicians Comm. for Responsible Med. v. Glickman*, 117 F. Supp. 2d 1 (D.D.C. 2000) (also

not permitting withholding under Exemption 6), is unclear from the record. After all, this could

be a situation in which it is an honor just to be nominated for this role. However, it is plausible

that these individuals would prefer to have their consideration and ultimately non-selection

withheld from the public's view.[6] The Court therefore finds that a sufficient privacy interest in

implicated in this case to warrant coverage under Exemption 6. Accordingly, the Court must next

"balance the individual's right of privacy against the basic policy of opening agency action to the

light of public scrutiny," *Norton*, 309 F.3d at 32, and consider whether the release of the

candidates' names will "contribut[e] significantly to public understanding of the operations or

activities of the government." *Fed. Labor Relations Auth.*, 510 U.S. at 495.

Defendants claim that the release of the names, without more, will not lead to a greater

understanding of the monitor selection process, *see* Def.'s Reply at 10, but Mr. Tokar claims that

it will, *see* Pl.'s Reply at 18–23. This time, Mr. Tokar's reliance on *Lardner* is instructive. In that

case, the Court found "that release of the identity of unsuccessful pardon applicants would shed

---

[6] The fact that Avon readily "agreed to voluntarily provide the name of [its] FCPA monitor and firm affiliation, as well as the two other candidates and their firm affiliation," because it did not believe that the information was "confidential business information," belies this assertion somewhat, however. *See* Pl.'s Mot., Ex. I, ECF No. 10-12. If the possibility of embarrassment to the unselected candidates were so obvious, Avon would have likely objected to the disclosure of the requested information, just as the fourteen other companies did.

light on the exercise of the pardon power in important ways," because "[a] comparison of successful and unsuccessful applicants would illuminate—indeed, a claim could be made that it is essential to an understanding of—the circumstances in which the executive chooses to grant or deny a pardon and the factors that bear on that decision." *Lardner*, 2005 WL 758267, at *17 (internal citation and quotation marks omitted).

Mr. Tokar has explained that "the names and professional services firms of corporate compliance monitor candidates would certainly assist Plaintiff in his reporting on how DOJ has implemented directives of the Morford Memorandum," because "[w]ithout disclosure of the names of candidates who are nominated, but not ultimately selected, for corporate monitorship positions, it is difficult (if not impossible) to know whether either the government or the corporate entity under investigation is taking advantage of the selection process in a manner that undermines the objectives of the DPA." Pl.'s Reply at 19–20. He explains further that, by evaluating who was nominated to be a monitor and who the agency did not ultimately choose, he will be able to learn about the inner workings of the selection process which is now cloaked in secrecy, outside of the supervision of any courts. *See id.* at 20–23. For example, the release of the names will allow him to investigate whether any of the fifteen companies pursued a strategy similar to the one Deutsche Bank attempted during its prosecution in the Southern District of New York, when it nominated three monitor candidates for the presiding judge to select from, two of whom were so underqualified that the judge selecting the monitor was given no choice but to select the third, who, presumably, was the company's first choice. *See id.* Mr. Tokar insists that the only way he will be able to discover this sort of manipulation of the system, or any other act of noncompliance with the Morford Memorandum, if it exists, is to receive the names of the unselected monitor candidates.

It is true, as DOJ points out, that Mr. Tokar would have had a much easier time learning about the inner workings of the monitor selection process if DOJ had simply responded to his initial FOIA request, rather than encouraging him to narrow its scope. However, the D.C. Circuit has recognized that "a relevant public interest could exist where [a list of names] might provide leads for an investigative reporter seeking to ferret out what government is up to." *Painting & Drywall Work Preservation Fund, Inc. v. Dep't Housing & Urban Dev.*, 936 F.2d 1300, 1303 (D.C. Cir. 1991) (internal quotation marks omitted) (quoting *Fed. Labor Relations Auth. v. U.S. Dep't of Treasury*, *Fin. Mgmt. Serv.*, 884 F.2d 1446, 1452 D.C. Cir. 1989)); *see also ACLU v. U.S. Dep't of Justice*, 655 F.3d 1, 15 (D.C. Cir. 2011) (recognizing that courts in this circuit should "take[] derivative uses into account in evaluating the impact of disclosure on the public interest"); *Gilman v. DHS*, 32 F.Supp.3d 1, 14–16 (D.D.C. 2014) (ordering the release of the names and addresses of private citizen landowners in a series of emails between the landowners and U.S Customs and Border Protection because in the aggregate, such information would assist the public in understanding the impact of CBP's construction of a wall along the U.S.-Mexico border). This sort of aggregating, for the purpose of discovering what the government is up to, is precisely what Mr. Tokar intends to do here. Because Mr. Tokar has demonstrated that the release of even this small amount of information will serve the public interest, to an extent that outweighs the candidates for these lucrative positions' interest in keeping their identities secret, the Court finds the unselected candidates' names cannot be properly withheld pursuant to Exemption 6. Therefore, DOJ is directed to release the names of any unselected monitor candidates that appear in any of the fifteen submitter notice response letters.

Although the names of the unselected candidates that appear in the table cannot be withheld pursuant to Exemption 6, the Court must consider whether they may be properly

withheld pursuant to Exemption 7(C).[7] Exemption 7(C) allows an agency to withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C). Although both Exemption 6 and Exemption 7(C) are meant to protect the private information of third parties from being divulged, Exemption 7(C) has less stringent requirements for withholding than Exemption 6, because in order to properly invoke it an agency need only show that the release of the information "could reasonably be expected" to be an "unwarranted" invasion of personal privacy, as opposed to a "clearly unwarranted" invasion of personal privacy. *See Braga v. FBI*, 910 F. Supp. 2d 258, 267 (D.D.C. 2012). "The courts have construed this provision as permitting exemption if the privacy interest at stake outweighs the public's interest in disclosure." *Nation Magazine, Washington Bureau v. U.S. Customs Service*, 71 F.3d 885, 893 (D.C. Cir. 1995) (citing *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press*, 489 U.S. 749, 776 (1989)). The D.C. Circuit has emphasized that "Exemption 7(C) takes particular note of the 'strong interest' of individuals, whether they be suspects, witnesses, or investigators, 'in not being associated unwarrantedly with alleged criminal activity.'" *Dunkelberger v. Dep't of*

---

[7] The documents used to create the table, as well as the table itself, contains information compiled for law enforcement purposes—the enforcement of the FCPA. *See Assassination Archives & Research Ctr., Inc. v. CIA*, 903 F. Supp. 131, 132–33 (D.D.C. 1995) (holding that information collected from criminal investigation files and compiled in an administrative file for use before a congressional committee "certainly satisfies the threshold requirement of Exemption 7"); *see also Stein v. DOJ*, 134 F. Supp. 3d 457, 485 (D.D.C. 2015). Mr. Tokar does not dispute the fact that the table was made from documents that were compiled for law enforcement purposes. Because the documents used to create the table were compiled for law enforcement purposes, the information gleaned from those files must be evaluated under both Exemption 6 and Exemption 7(C).

*Justice*, 906 F.2d 779, 781 (D.C. Cir. 1990) (quoting *Stern v. FBI*, 737 F.2d 84, 91-92 (D.C. Cir. 1984)).

The Court has already found that the release of these names "would constitute a clearly unwarranted invasion of personal privacy" under Exemption 6. As such, based on a purely linguistic analysis, the Court would also necessarily need to find that the release of these names "could reasonably be expected to constitute an unwarranted invasion of personal privacy" under Exemption 7(C). However, traditionally, the privacy interests at stake in an Exemption 7(C) analysis are those resulting from the stigma of being associated with a criminal investigation. *See e.g.*, *Fitzgibbon v. CIA*, 911 F.2d 755, 767 (D.C. Cir. 1990) (recognizing "strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity"); *Neely v. FBI*, 208 F.3d 461, 464–66 (4th Cir. 2000) (finding that law enforcement personnel and third-party suspects have "substantial interest[s] in nondisclosure of their identities and their connection[s] with particular investigations"). Additionally, courts have also found that if a witness or investigator's public association with a criminal investigation could lead to harassment, a sufficient privacy interest is implicated to warrant withholding under Exemption 7(C). *See e.g.*, *Computer Prof'ls for Soc. Responsibility v. U.S. Secret Serv.*, 72 F.3d 897, 904 (D.C. Cir. 1996) (citing *McDonnell v. United States*, 4 F.3d 1227, 1255 (3d Cir. 1993)).

Here, because the type of stigma or harassment that traditionally triggers protection under Exemption 7(C) is not present, as evidenced by the fact that DOJ freely released the names of those candidates who were selected to be compliance monitors—i.e. the actual people who would be associated with investigating whether the fifteen companies were complying with their

DPAs, the privacy interests are much weaker than in a traditional Exemption 7(C) case.[8]

Accordingly, because, as explained above, the Court has determined that Mr. Tokar has

sufficiently demonstrated that the public interest will be significantly served by the release of

these names, the public interest in disclosure of the information outweighs the weak privacy

interests at issue. Therefore, the Court finds that withholding the names of unselected candidates

pursuant to Exemption 7(C) is impermissible as well.

**2.  The Attorneys Who Sent and Received the Responses to the Submitter Notices**

Next the Court must consider DOJ's Exemption 6 redactions in its response to Mr.

Tokar's second FOIA request seeking the objection letters, when it chose to withhold 1) the

names of the attorneys who drafted the fifteen companies' responses to the submitter notices, and

2) the names of two DOJ employees who received some of the responses. *See* Def.'s Reply at 11;

Sprung Decl. ¶¶ 30, 32. DOJ justifies its redactions of the DOJ and private attorneys' names

pursuant to Exemption 6 by pointing out that Mr. Tokar "has failed to identify any public interest

in this information, and it is well-established that government employees and third-parties whose

names appear in government records have at least a modest privacy interest in non-disclosure."

Def.'s Reply at 12. Mr. Tokar argues in response that DOJ has failed to show that any of these

individuals have any privacy interest in preventing the disclosure of their names. *See* Pl.'s Reply

at 14–18.

As explained above, an agency may withhold personal information if "disclosure would

compromise a substantial, as opposed to a *de minimis*, privacy interest." *Horner*, 879 F.2d at

874. When a "substantial" privacy interest is at stake, the Court must "balance the individual's

---

[8] This conclusion is bolstered by the fact that one of the fifteen companies, Avon, did not object to the release of any of the information requested in Mr. Tokar's narrowed request, including the names of the unselected candidates. *See* Pl.'s Mot, Ex. I.

right of privacy against the basic policy of opening agency action to the light of public scrutiny."
*Norton*, 309 F.3d at 32 (citation and internal quotation marks omitted). The standard "means less
than it might seem," as a substantial privacy interest is "anything greater than a *de minimis*
privacy interest." *Multi Ag Media LLC*, 515 F.3d at 1229–30. The Supreme Court has held that
the only public interests relevant to the Exemption 6 analysis are those that "contribut[e]
significantly to public understanding of the operations or activities of the government." *Fed.
Labor Relations Auth.*, 510 U.S. at 495 (internal citation and quotation marks omitted)). In other
words, "information about private citizens that is accumulated in various governmental files but
that reveals little or nothing about an agency's own conduct" is not the type of information to
which FOIA permits access." *Id.* at 496 (citations and internal quotation marks omitted). This
protection applies even when the privacy interest at stake is modest, because "something, even a
modest privacy interest, outweighs nothing every time." *Horner*, 879 F.2d at 879.

The Court will first address DOJ's withholding of the names of the two DOJ attorneys,
whose job titles are Information Specialist and Trial Attorney. *See* Supp. Sprung Decl. ¶ 7.
Courts in this district have reached different conclusions regarding the magnitude of the privacy
interest lower-level government employees have in complete anonymity. For example, to support
his contention that the names of the two DOJ employees should be released, Mr. Tokar cites to
*Leadership Conference on Civil Rights v. Gonzalez*, in which a court found that there is "no
privacy interest associated with the agency paralegals and their involvement with
communications about plaintiff's FOIA requests." 404 F. Supp. 2d 246, 257 (D.D.C. 2005).
Conversely, however, in *Center for Public Integrity v. U.S. Department of Energy*, a court
refused to release the names of lower-level Department of Energy employees, who had been
accused of no misconduct or wrongdoing, that appeared in files the plaintiff had requested. No.

15-cv-1314, 2018 WL 401225, at *14–15 (D.D.C. Jan. 12, 2018). Finding that "there can be little doubt that these individuals have a 'substantial' privacy interest in avoiding disclosure of their names," and finding that the release of these names would bring the plaintiffs no closer to discovering "what the government is up to" in any meaningful sense, the court determined that it "need not linger over the balance" of the individual privacy interests at stake against the public interest in disclosure, because "[i]n the end, 'something, even a modest privacy interest, outweighs nothing every time.'" *Id.* at *15 (citations omitted).

In this case, Mr. Tokar has proffered no explanation of how the release of these attorneys' names will allow him to better understand the monitor selection process. As such, the Court must determine whether the attorneys at issue hold "even a modest privacy interest" in their anonymity that would warrant the continued withholding of their names. It is difficult to see how they do. The names of government attorneys involved in FCPA and FOIA matters are released in public court filings on a daily basis. Indeed, in this case, one of the names withheld belongs to a DOJ Trial Attorney, who, just like Mr. Sprung, the DOJ's public declarant in this case, must include their name, email address, and phone number on the docket of every case in which they file an appearance. There is no allegation that these attorneys have any particular interest in having their names remain anonymous, apart from the fact that they do not hold any leadership role within the Department of Justice. Indeed, Mr. Sprung and these attorneys served the exact same role in this case, receiving the responses to the submitter notices on behalf of DOJ, but Mr. Sprung's name and credentials have been documented extensively in this case. *See generally* Vaughn Index; Sprung Decl.; Supp. Sprung Decl. In *Horner*, the case DOJ cites for the proposition that "something, even a modest privacy interest, outweighs nothing every time," there was a clear privacy interest at stake because the document the plaintiff sought "reveal[ed]

not only the names and addresses of hundreds of thousands of individuals; it also indicate[d] that each [wa]s retired or disabled (or the survivor of such a person) and receive[d] a monthly annuity check from the federal Government." *Horner*, 879 F.2d at 876. The court worried that "[a]rmed with this information, interested businesses, charities, and individuals could, and undoubtedly would, subject the listed annuitants 'to an unwanted barrage of mailings and personal solicitations.'" *Id.* (quoting *Minnis v. U.S. Dep't of Agric.*, 737 F.2d 784, 787 (9th Cir. 1984)).

Here, so such interest in anonymity has been articulated. While it is true that "in evaluating the privacy impact of the release of information, the courts have taken into consideration potential derivative uses of that information," *ACLU*, 655 F.3d at 7, there is no indication in the record that Mr. Tokar, or anyone else, will use their knowledge of which DOJ employees handled the responses to the submitter notices for nefarious or harassing purposes. Therefore, without a showing of a modest, rather than simply a *de minimis*, privacy interest in the names remaining redacted, the Court orders that the names of the two DOJ employees be released.

Next the Court considers whether the names of the attorneys who responded on behalf of their clients to the submitter notices were properly redacted pursuant to Exemption 6. As a preliminary matter, each attorney who responded to the submitter notices were "advised that the information provided by the submitter under 28 C.F.R. § 16.8(f) may itself be subject to disclosure under the FOIA." Compl. Ex. 4, ECF No. 1-4. This warning put the attorneys on notice that their names could be revealed through a FOIA request. *Cf. Lardner*, 2005 WL 758267, at *16 (emphasizing that a regulation providing that that "[p]etitions, reports, memoranda, and communications submitted or furnished in connection with the consideration of a petition for executive clemency generally shall be available only to the officials concerned with

the consideration of the petition" contained the phrase "generally" and did not state that the fact that an application was submitted would remain confidential). DOJ has provided no evidence that making public a particular attorney's handling of a response to a submitter notice on behalf of their corporate client would amount to a modest invasion of that attorney's personal privacy. *See Landmark Legal Found. v. IRS*, 87 F. Supp. 2d 21, 28 (D.D.C. 2000) ("Without a more particularized assertion of the affected individuals' expectations of privacy with respect to the letters written and information provided to the government here, the court does not find more than a *de minimis* privacy interest."). Even if, as DOJ claims, the public interest will not be served by Mr. Tokar's receipt of these names, the fact that these attorneys have, at most, a *de minimis* privacy interest in keeping their names redacted, means that those names must be released.

## V.  CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 9) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's Motion for Summary Judgment (ECF No. 10) is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  March 29, 2018                                         RUDOLPH CONTRERAS
                                                                         United States District Judge